## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

GROW MICHIGAN, LLC,

                Plaintiff,                Case No. 20-11391

v.

LT LENDER, LLC, JERRY REINHARDT,
JOHN REINHARDT, BRUCE CAMPBELL,
PAUL SHAMO, ROBERT CAUSLEY,
DAMIAN KASSAB, and ROBERT DRAKE,

                Defendants.

_____/

## COMPLAINT AND JURY DEMAND

Plaintiff Grow Michigan, LLC ("GrowMI"), through counsel, alleges as follows for its Verified Complaint against Defendants LT Lender, LLC ("LT Lender"), Jerry Reinhardt, John Reinhardt, Bruce Campbell, Paul Shamo, Richard Causley, Damian Kassab, and Robert Drake (collectively, "Defendants"):

### Introduction

1.    GrowMI is a sub-debt lender that was induced by Defendants' conspiracy to lend $3.325 million to a Delaware start-up corporation based in Michigan, Lightning Technologies, Inc. ("Lightning"). GrowMI was led to believe that Lightning would use the proceeds of GrowMI's loan to pay off its previous lender, Defendant LT Lender, and then use the balance of GrowMI's $5 million loan facility, in conjunction with a loan from Flagstar Bank and Lines of Credit from

1

Defendant Shamo and Defendant Causley, to acquire the necessary production equipment in order to become fully operational.

2.     The individual Defendants in this action, however, had different plans for Lightning. Defendant Kassab, a shareholder in Lightning, has been executing on an aggressive plan to take over Lightning by using his position as an exclusive financial consultant and, subsequently Executive Vice President, to disrupt the Company's operations and discredit Lightning's executive team. It appears that Kassab's plan was to induce GrowMI to lend millions of dollars to Lightning to pay off certain Lightning shareholders who would support Kassab's position in a proxy battle for the control of Lightning.

3.     In order to execute this plan, Kassab needed to induce other shareholders to support his scheme. For most of 2019, in addition to being a Lightning shareholder, Kassab was also the exclusive financial advisor to Lightning. Kassab was responsible for negotiating with LT Lender for the repayment of the roughly $2.2 million it had loaned to Lightning. Kassab was also responsible for inducing Lightning to agree to pay an additional "settlement payment" of $1,000,0000 to LT Lender and its principals, Jerry Reinhardt, John Reinhardt, and Bruce Campbell (each also shareholders in Lightning). GrowMI believes that these payments were in exchange for the LT Lender's principals' support in the forthcoming shareholder dispute.

2

4.     In order to get the money necessary to pay off LT Lender's debt and pay the additional $1,000,000 to LT Lender and its principals, Kassab needed to induce lenders to provide capital to pay off that debt. GrowMI, a sub-debt lender with a mission of promoting job and business growth in Michigan, was a prime candidate. Although GrowMI does not usually lend money to start-up companies, GrowMI was induced to lend to Lightning because Defendants Shamo and Causley, both shareholders in Lightning, agreed to post $10,000,000 lines of credit that would be subordinate to GrowMI's financing and would be used for Lightning's operations and to purchase the necessary production equipment for Lightning. GrowMI would not have agreed to loan any money to Lightning without the Shamo and Causley lines of credit.

5.     Upon information and belief, Shamo and Causley's lines of credit were nothing more than sham documents—never intended to be drawn or used for financing any aspect of Lightning's operations. Rather, unbeknownst to GrowMI and upon information and belief, Kassab, Shamo, and Causley agreed that the Lines of Credit would be used only to induce GrowMI and Flagstar Bank to agree to lend money to Lightning, and that GrowMI's initial draw, $3.325 million, would go exclusively to LT Lender.

6.     Although GrowMI believed that its $5 million commitment would be the critical piece to round out Lightning's capitalization and ensure Lightning

achieved full production capacity, Kassab and Defendants had different plans. GrowMI's funded its initial draw in August, 2019. 100% of Grow's initial draw went to pay the debt of LT Lender, plus the additional $1,000,000 settlement payment that GrowMI knew nothing about. Kassab, who had become an executive Vice President of Lightning and who had exclusive control of its finances, refused to purchase the equipment Lightning needed. Kassab advised the Lightning Board of Directors that the Shamo and Causley lines of credit were only for emergencies, and that they could not be drawn upon for funding the equipment acquisition.

7.     Without the additional equipment, Lightning soon fell behind on its payments to GrowMI, and was thrown into financial turmoil. This financial turmoil discredited Lightning's leadership, and Kassab and the other Defendants have engaged in a proxy battle in an attempt to take over Lightning. The proxy battle continues through the date of this filing.

8.     Should they fail to seize control of Lightning, Defendants appear to have a backup plan. Since December 2019, a Lightning employee, Defendant Drake, has been illegally downloading Lightning's confidential trade secrets to his own computers. Based on forensic analysis performed on his Lightning computers, Drake has connected hard drives to his Lightning computers, presumably to copy the Lightning trade secrets he downloaded. Although such an act in other circumstances may only be seen as the act of a rogue employee, in these circumstances GrowMI

4

believes that Defendants have used Drake to provide the necessary trade secrets to them to be able to recreate Lightning's proprietary products.

9.      Defendants' conduct constitutes a racketeering enterprise that subjects them to liability for GrowMI's damages arising from this conduct. To date, Lightning does not have the ability to repay its debt to GrowMI, and GrowMI's principal is still outstanding. As set forth in this Complaint, Defendants are liable to GrowMI under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq*, in addition to common law claims for fraud, unjust enrichment, and conspiracy.

## The Parties

10.      GrowMI is a Michigan limited liability company with its principal place of business located in Oakland County, Michigan.

11.      LT Lender is a Michigan limited liability company with its principal place of business located in Oakland County, Michigan.

12.      John Reinhardt is a Michigan resident, and a principal of LT Lender.

13.      Jerry Reinhardt is a Michigan resident, and a principal of LT Lender.

14.      Bruce Campbell is a Michigan resident, and a principal of LT Lender.

15.      Paul Shamo is a Michigan resident.

16.      Robert Causley is a Michigan resident.

17.      Damian Kassab is a Michigan resident.

18.     Robert Drake is a Michigan resident.

## Jurisdiction and Venue

19.     The events giving rise to this Complaint took place in Oakland county, Michigan.

20.     GrowMI seeks relief under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, which establishes a basis for subject matter jurisdiction under 28 U.S.C. § 1331.

21.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remaining claims set forth in this Complaint because they are so related to the RICO claim that they form part of the same case or controversy under Article III of the United States Constitution.

22.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) because all defendants reside within this judicial district.

## General Allegations

23.     GrowMI is a sub-debt lender that focuses on community reinvestment by providing growth capital to Michigan-based small and mid-sized businesses. Its mission is to support and nurture Michigan's small businesses in an effort to create and retain jobs and increase tax revenue for the State. GrowMI is funded by a collaboration of a number of Federal and state chartered commercial banks doing business in Michigan, as well as the Michigan Strategic Fund as administered by its

agent, and the State of Michigan through the Michigan Economic Development Corporation, an economic arm of the State of Michigan.

24.   Any losses incurred by GrowMI as a result of non-payment by GrowMI's borrowers are nearly entirely borne by the State of Michigan and its taxpayers. Consequently, GrowMI is vigilant about ensuring that its borrowers do not take advantage of its loans that are intended to advance the Michigan economy.

25.   Although GrowMI does not usually lend to early stage businesses, GrowMI made the decision to lend to Lightning because it presented a specific plan to GrowMI that would produce 100 new jobs in Michigan by manufacturing and deploying its proprietary technology for a lightweight, hybrid pallet that provides higher durability and increased weight-to-strength performance in order to maximize load and reduce shipping costs. The Lightning pallet utilizes anti-microbial and anti-fungal additives, as well as a proprietary tracking technology, making it particularly useful in the shipment of cold food products, such as bananas, berries, and yogurts.

26.   Lightning's product was viewed as unique, innovative, and transformative within the logistics industry.

27.   Lightning has developed significant trade secrets and confidential information relating to RFID technology, related software, coatings, and related formulations and application processes, as well as numerous trademarks, licenses, patents, and pending patent applications (the "Trade Secrets").

7

28.    Given that Lightning was a start-up, Lightning did not have significant assets other than its Trade Secrets to secure GrowMI's loan to Lightning.

29.    Because GrowMI does not normally fund early stage businesses, it was essential for Lightning to have all committed capital before GrowMI would commit its funds.

30.    During 2019 and prior to funding any loan to Lightning, GrowMI worked with Lightning to identify, develop, and structure the capital necessary to fund its business and satisfy the conditions precedent for the advancement of the GrowMI funds.

31.    The plan was based on the need to raise roughly $26 million from a combination of debt and equity, which was generally as follows: $7 million from Flagstar Bank, $5 million from GrowMI, $10 million from certain lines of credit, and $4 million in additional equity.

32.    Of the $26 million budgeted capital needed, approximately $14 million was for machinery and equipment purchases, and approximately $10 million was for working capital and operational expenses.

33.    Thus, in addition to GrowMI's loan, Lightning also secured a $7,000,000 credit facility with Flagstar Bank, one of GrowMI's member banks; $6,000,000 of the credit facility was an equipment loan, and $1,000,000 was a revolving line of credit.

8

34.    The Flagstar equipment loan expressly required that Flagstar would provide approximately 40% of the money for the equipment purchases, and 60% of the money would come from Grow Michigan and other debt subordinated to Flagstar's loan or equity.

35.    Prior to closing on its credit facilities with GrowMI and Flagstar, Lightning represented that it could become fully operational by June or July 2020 if it had the cash to purchase the necessary machinery and equipment and pay the associated build-out expenses so that Lightning could turn into a sustainable profit generating company by fall of 2020.

36.    Prior to closing on the credit facilities with GrowMI and Flagstar, Lightning represented that it would order and pay for the equipment before the end of December 2019, the equipment would be delivered sometime in Spring 2020, and Lightning would be at full production by June or July 2020.

37.    In order to ensure that Lightning would be able to meet its schedule and the monetary demands for the acquisition and implementation of the production equipment, GrowMI required as a condition to its funding that Lightning secure the additional equity or subordinated debt described above.

38.    Lightning obtained an additional equity investment from MarkIV Capital in order to meet GrowMI's requirements.

39.    Lightning also produced two lines of credit to shore up the cash shortfall to buy the equipment represented to be $14 million and to fund operating deficits as the company ramped-up production.

40.    Specifically, Lightning obtained lines of credit from Paul Shamo and Robert Causley, each in the amount of $5,000,000 (the "Lines of Credit"). (**Exs. A**, **B**.)

41.    Shamo and Causley were both shareholders in Lightning when they agreed to provide the Lines of Credit.

42.    Shamo and Causley both executed subordination agreements with GrowMI and Flagstar, confirming the validity of the Lines of Credit and that their debt would be subordinate to the GrowMI debt.

43.    Among other things, the subordination agreements constituted a specific representation by Shamo and Causley to GrowMI and Flagstar that the Lines of Credit were available for Lightning to draw upon.

44.    Lightning, through Damian Kassab, understood that the Lines of Credit were material to GrowMI's decision to fund its loan to Lightning. GrowMI regularly sent correspondence to Mr. Kassab and Lightning's attorney, Aaron Fales, demanding that the Lines of Credit be definitive.

45.    The GrowMI and Flagstar loan documentation also made it clear that the Lines of Credit were a condition to closing with GrowMI.

46. Because Lightning appeared to have satisfied GrowMI's conditions precedent for funding its loans, on August 30, 2019, GrowMI committed up to $5,000,000 to Lightning pursuant to a Business Loan Agreement. (**Ex. C**.)

47. On August 30, 2019, in addition to the GrowMI Business Loan Agreement, Lightning also executed a Security Agreement and an Intellectual Property Security Agreement. (**Exs. D**, **E**.)

48. Without the Lines of Credit, GrowMI would not have loaned any money to Lightning because, based on Lightning's own representations, Lightning would not have had sufficient funds to become operational and begin to generate revenue in 2020 so that it could repay its debt to GrowMI and the other lenders.

49. GrowMI made it clear to Lightning, Shamo, and Causley that the Lines of Credit were a prerequisite for GrowMI to enter into the Loan Agreement with Lightning.

50. With the Lines of Credit, Lightning had enough money to be able to order the equipment necessary to get to full production capacity.

51. At the time GrowMI was induced to commit to the $5,000,000 loan facility, Lightning represented that it would draw on, among other things, the Flagstar equipment facility and the Lines of Credit, in order to purchase the necessary equipment to enter production of its high-tech pallets.

52.    Prior to the closing on the GrowMI and Flagstar loan facilities, Lightning advised GrowMI that its initial draw from GrowMI in the amount of $3.325 million would be used to pay off its prior lender, LT Lender. GrowMI consented to repayment of LT Lender in order to provide GrowMI a first secured position on the intellectual property in which LT Lender already had a secured interest, and because Lightning, Shamo, and Causley represented to GrowMI that Lightning would have sufficient funds to get to full production capacity.

53.    GrowMI was lead to believe that the amount that Lightning owed LT Lender as of August 30, 2019, was $3,325,000.

54.    GrowMI has recently learned that the actual amount Lightning owed LT Lender as of August 30, 2019, was approximately $2,300,000.

55.    The additional $1,000,000 paid to LT Lender was a "premium payment" to settle a disputed claim by LT Lender of a sizable equity stake in Lightning.

56.    Upon information and belief, Kassab, purportedly acting on behalf of Lightning as its exclusive financial advisor, negotiated the settlement of the debt to LT Lender.

57.    Upon information and belief, Kassab, also a shareholder of Lightning, urged Lightning to accept the LT Lender settlement.

12

58.     Kassab advocated for the LT Lender settlement by convincing Lightning that LT Lender's principals had a bona fide claim to a substantial equity stake in Lightning.

59.     Upon information and belief, while Lightning disputed LT Lender's principals' claims, Kassab nevertheless convinced Lightning to accept the settlement so that his co-conspirators could reduce their financial investment risk in Lightning in exchange for supporting Kassab's proxy battle for the control of Lightning.

60.     Upon information and belief, the members of LT Lender were Jerry Reinhardt, John Reinhardt, James Pohlman, Robert Robinson and Bruce Campbell.

61.     Bruce Campbell sits on the Board of Directors of Lightning.

62.     Bruce Campbell, Jerry Reinhardt, and John Reinhardt are shareholders in Lightning.

63.     After GrowMI funded the initial draw to Lightning, Lightning advised GrowMI that it used the funds to pay off the full amount of the debt owed to LT Lender.

64.     In reality, Lightning's debt to LT Lender was less than what was represented, and the GrowMI draw was used to pay off the debt to LT Lender, and to provide a substantial gratuity to LT Lenders and its members, including Jerry Reinhardt, John Reinhardt, and Bruce Campbell.

65.    Upon information and belief, the money LT Lender received from the GrowMI draw was distributed to its members, Jerry Reinhardt, John Reinhardt, James Pohlman, Robert Robinson, and Bruce Campbell.

66.    At all times GrowMI was considering loaning money to Lightning, Shamo, Causley, and LT Lender's principals held themselves out as equity owners in Lightning.

67.    Although Lightning represented to GrowMI that it would draw on the Flagstar loan, GrowMI loan, and the Lines of Credit to order and pay for its production equipment before December 31, 2019, Lightning did not draw on its credit facilities (other than to payoff LT Lender) and it did not order or pay for its production equipment.

68.    GrowMI repeatedly demanded that Lightning use the available financing in order to order the equipment.

69.    Based on the financial and operational information provided by Lightning, nothing prevented Lightning from drawing on the credit facilities from Flagstar or the Lines of Credit in order to order and pay for its production equipment.

70.    For months, from December 2019 through February 2020, GrowMI's CEO, Patrick O'Keefe, would ask Lightning's President, Jeffrey Owen, to draw on and disburse the available credit facilities to order the equipment necessary to get Lightning to full production. In response, Jeff Owen advised Mr. O'Keefe that

Kassab had control of the disbursement of funds, and although Mr. Owen relayed GrowMI's request to Kassab, he never received a response to the request to order product and draw on the funds available to the company.

71.    Apparently, Lightning had delegated the responsibility for raising funds to Kassab and Kassab also was in control of all finance decisions—including whether and when to draw upon available capital.

72.    Lightning never drew on the Flagstar equipment loan facility, the balance of the GrowMI loan facility, or the Lines of Credit in order to order and pay for the equipment.

73.    Upon information and belief, Kassab, Shamo, and Causley all agreed, prior to Lightning obtaining the GrowMI loan, that Lightning would not actually draw on the Lines of Credit. Rather, Kassab, Shamo, and Causley, in agreement with LT Lender and its members, would induce GrowMI to make its loan in order to pay off the LT Lender loan and provide returns to the insiders, but that Lightning would not use the Flagstar financing or the Lines of Credit in order to obtain production equipment.

74.    Upon information and belief, Kassab, Shamo and Causley never intended for Lightning to draw on the Lines of Credit, and that the Lines of Credit were merely executed in order to fraudulently induce GrowMI to fund its loan to Lightning so that its money could be transferred to LT Lender and its members.

75.    In fact, Kassab represented to Lightning's Board of Directors that the Causley and Shamo Lines of Credit were only for "emergencies," contrary to the representations made to GrowMI and the express language of the Lines of Credit.

76.    Defendants' actions were designed to limit Defendants' actual cash investment in Lightning before they aggressively embarked on a plan to take control of the company through a heated proxy battle.

77.    Because Kassab refused to draw upon the available financial facilities other than to take GrowMI's money to pay off his co-conspirators, Lightning's financial future was threatened. Kassab used the company's failure to his advantage to discredit Lightning's leadership in the proxy battle.

78.    Specifically, Defendants have all joined forces in the recent proxy battle in order to seize control of Lightning.

79.    The proxy battle for control of Lightning has not been resolved, and it has paralyzed the company.

80.    Lightning is not paying its debts as they come due, including, for example, its rent.

81.    Rather than drawing on the available, approved loan facilities, Lightning apparently took on an additional $1 million in debt from Shamo in February 2020 to purportedly fund its operations (the "Shamo Loan").

82.    The Shamo Loan was separate from Shamo's obligations under the Lines of Credit.

83.    The Shamo Loan was made in violation of Lightning's Business Loan Agreement because Lightning was not allowed to incur additional indebtedness other than what was already approved at the time Lightning entered into the GrowMI Loan Agreement.

84.    Upon information and belief, despite the fact that he is a member of the Lightning Board of Directors, Shamo knew that inducing Lightning to incur additional debt was in violation of the Business Loan Agreement.

85.    The Shamo Loan was made, in part, so that Kassab, acting in his role as Executive Vice President, could pay his own company, Solyco, LLC, nearly $400,000 allegedly as a finder's fee for raising capital—capital that was ultimately fictitious and without any real benefit to Lightning.

86.    Contrary to the subordination agreement signed between Shamo and GrowMI, Shamo now claims that he has a secured interest ahead of GrowMI with regard to Lightning's collateral.

87.    Upon information and belief, the Shamo Loan was more expensive than the available credit facilities from Flagstar, GrowMI, and the Lines of Credit, so that Shamo could receive a benefit for participating in the scheme to defraud GrowMI.

88.     Rather than using the available Lines of Credit, the Flagstar equipment loan, and the balance of the GrowMI facility in order to order and purchase the production equipment, in 2020, Lightning instead attempted to obtain financing from a company called NFS to move to full production capabilities.

89.     There would be no need to obtain financing from NFS if the Lines of Credit were legitimate, but because they were bogus, Lightning did not have the resources to order its equipment without significant additional funding.

90.     Lightning was introduced to NFS by an outside broker, Kevin Parker.

91.     Lightning agreed to pay a commission to Mr. Parker in the event the financing with NFS was successful.

92.     While the contract with NFS was being negotiated, Kassab approached Mr. Parker and demanded that Mr. Parker pay him a portion of the commission Lightning was to pay Mr. Parker.

93.     Although Kassab was a salaried employee with Lightning with significant fiduciary obligations to Lightning and its creditors, Kassab was still looking for ways to profit at Lightning's expense by attempting to obtain a kickback as Lightning's financial broker, even though he was not entitled to anything other than his salary.

94.   NFS ultimately did not proceed with any financing package for Lightning, and Lightning has not been able to get to full production capacity for its innovative pallets.

95.   Since the NFS financing has fallen through, Lightning has been beset by the proxy battle among its shareholders and the members of its Board of Directors that has effectively frozen the company's ability to function, conduct business, or attract capital.

96.   Further, upon information and belief, Defendants' actions were so egregious as to constitute criminal bank fraud, further putting Lightning at great peril and compromising GrowMI's ability to recoup its loans.

97.   With the benefit of hindsight, it is now apparent that Defendants' conspiratorial and devious scheme to seize control was hatched months ago with the intent of defrauding GrowMI.

98.   The proxy battle was initiated by Kassab, Shamo, Causley, and LT Lender's principals acting in concert to seize control of the company.

99.   Despite Lightning's paralysis, Lightning has presented GrowMI with a budget for moving forward over the next two months.

100.   If Lightning were able to draw on the Lines of Credit, the budget appears to demonstrate that Lightning would have sufficient funds to become current

on its loan with GrowMI and to begin order equipment necessary to get to partial production of its pallets.

101.    Because Lightning is currently in default under the GrowMI Loan Agreement, GrowMI has the authority to act on a behalf of Lightning through a power of attorney granted it by the Security Agreement between Lightning and GrowMI.

102.    Acting on its authority under the power of attorney, GrowMI made demand on Shamo and Causley to partially disburse the money committed under the Lines of Credit to fund the next 30 days of Lightning operations consistent with the presented budget. (**Ex. F**.)

103.    Shamo and Causley have refused to provide any funds under their Lines of Credit, further demonstrating that they were sham commitments. (**Ex. G**.)

104.    GrowMI reasonably relied on the Shamo and Causley Lines of Credit when making a decision to loan money to Lightning.

105.    Because of Shamo and Causley's fraud, GrowMI has been damaged by Defendants' actions.

106.    GrowMI seeks judgment as set forth below.

### Count I – Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, Against All Defendants

107.    GrowMI restates the preceding paragraphs as though fully stated here.

108.   Defendants' conduct constituted an enterprise through a pattern of racketeering activity. Defendants engaged in at least four predicate acts, which together formed an enterprise that significantly damaged GrowMI.

Predicate Act No. 1 – Violation of 18 U.S.C. § 1344

109.   Shamo presented his Line of Credit and associated Subordination Agreement to GrowMI and Flagstar prior to GrowMI and Flagstar agreeing to provide their loan facilities to Lightning Technologies.

110.   Shamo knew that his Line of Credit was a material condition precedent for GrowMI and Flagstar to fund their loan facilities to Lightning Technologies.

111.   Without the Shamo Line of Credit, neither GrowMI nor Flagstar would have proceeded with the loan facility to Lightning.

112.   At the time Shamo presented his Line of Credit and Subordination Agreement to GrowMI and Flagstar, Shamo had no intention of funding the Line of Credit.

113.   The Line of Credit was a false representation at the time Shamo presented it to GrowMI and Flagstar.

114.   The Subordination Agreement was a false representation at the time Shamo presented it to GrowMI and Flagstar.

115.   Shamo intended GrowMI and Flagstar to rely upon the Line of Credit and Subordination Agreement.

116.    Upon information and belief, Shamo and the other Defendants had agreed that the Line of Credit would not be drawn upon, and that it was only intended to induce GrowMI and Flagstar to agree to provide the loan facilities to Lightning so that LT Lender and its principals could be repaid.

117.    Upon information and belief, Defendants knew at the time the Line of Credit and Subordination Agreement were executed by Shamo that they were sham documents.

118.    Defendants' scheme was intended to deceive Flagstar and GrowMI.

119.    Defendants' scheme was intended to deceive Flagstar and GrowMI out of something of value.

120.    Flagstar is a federally insured financial institution.

121.    A large portion of GrowMI's capital has been provided by financial institutions with significant governing control over GrowMI, including control of its investment committee.

122.    But for Defendants' defrauding Flagstar into entering into its loan agreement with Lightning, GrowMI would not have agreed to fund its draw to Lightning.

123.    GrowMI was directly damaged by Defendants' defrauding of Flagstar.

124.    Defendants also had the intent to deceive or cheat GrowMI.

125.    Shamo's false Line of Credit and Subordination Agreement constituted false or fraudulent pretenses, representations, and promises.

126.    Shamo's false Line of Credit and Subordination Agreement were done voluntarily, and were not because of mistake or some other reason.

127.    Shamo's false Line of Credit and Subordination Agreement were material to GrowMI's decision to distribute money to Lightning subject to its business loan agreement.

128.    GrowMI suffered a financial loss as a result of the Defendants' deception of Flagstar and GrowMI in violation of 18 U.S.C. § 1344.

Predicate Act No. 2 – Violation of 18 U.S.C. § 1344

129.    Causley presented his Line of Credit and associated Subordination Agreement to GrowMI and Flagstar prior to GrowMI and Flagstar agreeing to provide their loan facilities to Lightning Technologies.

130.    Causley knew that his Line of Credit was a material condition precedent for GrowMI and Flagstar to fund their loan facilities to Lightning Technologies.

131.    Without the Causley Line of Credit, neither GrowMI nor Flagstar would have proceeded with the loan facility to Lightning.

132.    At the time Causley presented his Line of Credit and Subordination Agreement to GrowMI and Flagstar, Causley had no intention of funding the Line of Credit.

133. The Line of Credit was a false representation at the time Causley presented it to GrowMI and Flagstar.

134. The Subordination Agreement was a false representation at the time Causley presented it to GrowMI and Flagstar.

135. Causley intended GrowMI and Flagstar to rely upon the Line of Credit and Subordination Agreement.

136. Upon information and belief, Causley and the other Defendants had agreed that the Line of Credit would not be drawn upon, and that it was only intended to induce GrowMI and Flagstar to agree to provide the loan facilities to Lightning so that LT Lender and its principals could be repaid.

137. Upon information and belief, Defendants knew at the time the Line of Credit and Subordination Agreement were executed by Causley that they were sham documents.

138. Defendants' scheme was intended to deceive Flagstar and GrowMI.

139. Defendants' scheme was intended obtain something of value from Flagstar and GrowMI.

140. Flagstar is a federally insured financial institution.

141. GrowMI's investment committee is controlled by financial institutions, and the resources GrowMI deploys are derived by contributions made, in part, by financial institutions.

142.    But for Defendants' defrauding Flagstar into entering into its loan agreement with Lightning, GrowMI would not have agreed to fund its draw to Lightning.

143.    GrowMI was directly damaged by Defendants' defrauding of Flagstar.

144.    Defendants also had the intent to deceive or cheat GrowMI.

145.    Shamo's false Line of Credit and Subordination Agreement constituted false or fraudulent pretenses, representations, and promises.

146.    Shamo's false Line of Credit and Subordination Agreement were done voluntarily, and were not because of mistake or some other reason.

147.    Shamo's false Line of Credit and Subordination Agreement were material to GrowMI's decision to distribute money to Lightning subject to its business loan agreement.

148.    GrowMI suffered a financial loss as a result of the Defendants' deception of Flagstar and GrowMI in violation of 18 U.S.C. § 1344.

Predicate Act No. 3 – Violation of 18 U.S.C. § 1957

149.    Defendants conducted a financial transaction with GrowMI's initial $3.25 million draw to Lightning.

150.    GrowMI wired the funds directly to LT Lender.

151.    LT Lender used the funds to surreptitiously repay certain alleged equity holders in Lightning.

152.   LT Lender and its principals, Jerry Reinhardt, John Reinhardt, and Bruce Campbell, knew that the money from GrowMI was the result the unlawful activity of Shamo and Causley defrauding GrowMI and Flagstar Bank in violation of 18 U.S.C. § 1344.

153.   LT Lender and its principals, Jerry Reinhardt, John Reinhardt, and Bruce Campbell had the intent to promote the carrying on of the defrauding of GrowMI and Flagstar Bank in violation of 18 U.S.C. § 1344.

154.   GrowMI has suffered a financial loss as a result of LT Lender and its principals, Jerry Reinhardt, John Reinhardt, and Bruce Campbell, accepting GrowMI's money that was obtained as a result of the defrauding of GrowMI and Flagstar Bank in violation of 18 U.S.C. § 1344.

Predicate Act No. 4 – Violation of 18 U.S.C. § 1832

155.   Drake has access to Lightning's Trade Secrets in Lightning's online storage service, ShareFile.

156.   Lightning's Trade Secrets are not publicly available, and Lightning's Trade Secrets derive significant value as a result of them not being publicly available.

157.   Lightning takes significant care to ensure that its Trade Secrets do not become publicly available.

158.   Lightning's Trade Secrets are used in interstate and foreign commerce.

26

159.   Lightning's Trade Secrets would be a significant economic benefit to anyone other than Lightning interested in the production of goods that are unique and transformative to the logistics industry.

160.   The disclosure of Lightning's Trade Secrets outside Lightning will injure Lightning and compromise GrowMI's ability to collect on its loan agreement.

161.   Since December 2019, shortly after LT Lender was paid off with GrowMI's money, Drake has, without authorization, taken Lightning Trade Secrets by downloading them to his laptop and hard drives.

162.   The Lightning files downloaded by Drake consist of Lightning's Trade Secrets: highly confidential and commercially sensitive information, including customer lists, vendor lists, and information regarding proprietary technology.

163.   Upon information and belief, Drake copied Lightning's confidential Trade Secrets to hard drives with the intent of distributing them to the Defendants.

164.   Upon information and belief, Drake was acting on the direction of some or all of Defendants.

165.   Upon information and belief, Drake knowingly participated in the conduct of the affairs of the enterprise when he downloaded and transferred Lightning's confidential Trade Secrets to his laptop and hard drives.

166.   It is no coincidence that Drake is represented by the same lawyer representing Causley and Shamo, demonstrating the unity of action amongst Defendants.

167.   Drake intended to convert Lightning's Trade Secrets for the benefit of Defendants, in the event their proxy battle failed to give them control of Lightning.

168.   The disclosure of Lightning's Trade Secrets significantly reduces the value of the collateral pledged to secure GrowMI's loan.

169.   GrowMI has been damaged by Drake's actions in compromising Lightning's Trade Secrets, reducing GrowMI's ability to recover the debt that it is owed by Lightning.

Defendants' Enterprise

170.   Defendants formed an enterprise with the ultimate aim of control of Lightning and/or its Trade Secrets.

171.   Kassab, Shamo, Causley, and Campbell conspired to agree to ensure the LT Lender debt was repaid and a significant payment was made on the alleged equity stake held by LT Lender's principals.

172.   In exchange for this payment, Jerry Reinhardt, John Reinhardt, and Bruce Campbell agreed to support an attempt for Defendants to control Lightning through a heated proxy battle.

28

173.   In the event the Defendants were unable to be successful at the proxy battle, Defendants had secured Lightning's Trade Secrets through Drake's unauthorized copying and downloading so that they could pursue development of their own proprietary, competitive pallet.

174.   Defendants' enterprise continues to wage its proxy battle and refuses to turn over the hard drives containing Lightning's Trade Secrets.

Defendants' Conduct

175.   Defendants, shareholders of and lender to Lightning, knowingly participated in the conduct of the affairs of the enterprise to defraud GrowMI and Flagstar.

176.   Defendants' conduct was part of a concerted effort to reduce Jerry Reinhardt's, John Reinhardt's, and Bruce Campbell's risk of investment in Lightning, at the expense of GrowMI, so that they would support Kassab's, Shamo's, and Causley's attempt to control the company.

177.   Defendants' having been repaid a significant amount of their alleged equity stake in Lightning, had little risk in forcing the proxy battle that effectively crippled Lightning; putting Defendants in an excellent position to obtain control of Lightning or its assets without repaying all of Lightning's debts and obligations.

Defendants' Pattern of Racketeering Activity

178.   Defendants' conduct constitutes a pattern of racketeering activity.

179.    The predicate acts, outlined above, were done in concert and with the specific intent of inducing GrowMI to fund its substantial draw to Lightning for the benefit of LT Lender and its investors, in exchange for LT Lender's principals' support in the proxy battle for the control of Lightning.

180.    Defendants Kassab, Shamo, and Campbell acted in concert with the other Defendants to then drive Lightning to a heated proxy battle.

181.    Rather than doing what was promised to GrowMI—namely, purchasing production equipment—Defendants intentionally did nothing so that Lightning would be placed in dire financial straits.

182.    Once Lightning was in dire financial straits (but with the Defendants' risk significantly reduced), Defendants began the heated proxy battle for the control of Lightning.

183.    Defendants' conduct has not been resolved, nor does it appear to be concluding any time soon, as Defendants see this as an opportunity to control Lightning's proprietary technology without providing adequate value for the same.

184.    Upon information and belief, in the event that Defendants' proxy battle is unsuccessful, Defendants nevertheless secured Lightning's Trade Secrets for their own benefit by having Drake copy Lightning's Trade Secrets to hard drives.

185.   As of the filing of this Complaint, Defendants have refused to turn over for inspection and securing the hard drives to which Drake copied Lightning's Trade Secrets.

186.   Defendants' continued refusal to turn over the hard drives confirms that their pattern of racketeering activity will continue into the future.

187.   GrowMI has been suffered damages directly as a result of this pattern of racketeering activity. The collateral pledged for the security of GrowMI's loan to Lightning has been compromised, GrowMI has incurred significant costs, and Lightning's ability to repay its substantial debt to GrowMI has been imperiled.

188.   GrowMI seeks judgment as set forth below.

## Count II – Fraud Against Shamo, Causley, and Kassab

189.   GrowMI restates the preceding paragraphs as though fully stated here.

190.   GrowMI negotiated in good faith with Lightning regarding the amount of money required for Lightning to be able to move to full production capacity.

191.   As a result of the amount of money required by Lightning to move to full production capacity, GrowMI required that Lightning obtain additional credit and equity.

192.   Shamo, Causley, and Kassab knew GrowMI would not fund without the Lines of Credit, and they presented these bogus Lines of Credit with the intent of defrauding GrowMI.

31

193.   Shamo and Causley directly represented to GrowMI that they had pledged $10,000,000 to Lightning via the Lines of Credit that would allow Lightning to move to full production capacity.

194.   In fact, Shamo and Causley provided a copy of their Lines of Credit to GrowMI, and Shamo and Causley executed Subordination Agreements with GrowMI confirming their Lines of Credit.

195.   Kassab directly represented to GrowMI that Lightning had secured the $10,000,000 Lines of Credit that would allow Lightning to move to full production capacity.

196.   GrowMI reasonably relied on these representations from Shamo, Causley, and Kassab.

197.   Upon information and belief, at the time Shamo and Causley presented their Lines of Credit to GrowMI, Shamo and Causley had no intention of actually funding them, and Kassab had no intention of causing Lightning to draw upon them.

198.   GrowMI had no idea that Shamo and Causley had no intention of actually funding their Lines of Credit.

199.   Because Shamo and Causley have not funded the Lines of Credit, Lightning could not order the production equipment so that it could generate the revenue to be able to repay the GrowMI loan to Lightning.

200.   As a result of Shamo's, Causley's, and Kassab's misrepresentations to GrowMI, GrowMI funded a loan that was never going to be repaid.

201.   GrowMI has suffered damages as a result of Shamo 's, Causley's, and Kassab's fraudulent representations.

202.   GrowMI seeks judgment as set forth below.

### Count III – Unjust Enrichment Against LT Lender, Jerry Reinhardt, John Reinhardt, and Bruce Campbell

203.   GrowMI restates the preceding paragraphs as though fully stated here.

204.   Upon closing of the Lightning loan, GrowMI directly wired funds to LT Lender to pay 100% of the debt owed by Lightning to LT Lender, and to provide a substantial return to the Defendant investors of Lightning.

205.   The payment of funds directly to LT Lender was a direct benefit to LT Lender from GrowMI.

206.   Through all times relevant, GrowMI fulfilled its obligations to LT Lender.

207.   GrowMI suffered a detriment when LT Lender, Jerry Reinhard, John Reinhardt, and Bruce Campbell wrongfully conspired (a) with Kassab to convince Lightning that LT Lender had a beneficial claim to a sizeable equity stake and that LT Lender was entitled to the $1,000,000 "premium payment" and (b) with the other Defendants to induce GrowMI to fund Lightning knowing that Shamo and Causley

would never fund the Lines of Credit, and Lightning's ability to repay GrowMI would be compromised.

208.   As a result of Defendants' wrongful conduct, LT Lender, Jerry Reinhard, John Reinhardt, and Bruce Campbell received the full benefit of their bargain with GrowMI without providing adequate value for the same.

209.   The tremendous disparity between the enrichment realized by LT Lender, Jerry Reinhard, John Reinhardt, and Bruce Campbell to the detriment of GrowMI constitutes unjust enrichment.

210.   GrowMI has suffered damages as a result of Defendants' actions.

211.   GrowMI seeks judgment as set forth below.

## Count IV – Conspiracy Against All Defendants

212.   GrowMI restates the preceding paragraphs as though fully stated here.

213.   Defendants Damian Kassab, LT Lender, Jerry Reinhard, John Reinhardt, and Bruce Campbell conspired with Shamo, and Causley to induce GrowMI to fund its loan in order to be able to repay LT Lender for the benefit of all the Defendants.

214.   Upon information and belief, Defendants also conspired with Drake to secure the Trade Secrets for their benefit in the event that their proxy battle with Lightning failed.

215.   As a result of this concerted action by this combination of Defendants, GrowMI has been defrauded and Defendants were unjustly enriched.

216.   As a result of Defendants' civil conspiracy, GrowMI was damaged.

217.   As a result of Defendants' civil conspiracy, GrowMI is entitled to exemplary damages.

218.   GrowMI seeks judgment as set forth below.

### Count V – Breach of Contract

219.   GrowMI restates the preceding paragraphs as though fully stated here.

220.   The Lines of Credit constitute valid contractual relationships between Lightning and Shamo and Lightning and Causley.

221.   GrowMI has a valid power of attorney allowing it to exercise Lightning's contractual rights under the Lines of Credit.

222.   GrowMI made a demand that Shamo and Causley fund a portion of their obligations under the Lines of Credit.

223.   Shamo and Causley refused to fund any portion of their obligations under the Lines of Credit.

224.   Shamo's and Causley's refusal to fund their obligations under the Lines of Credit constitutes breaches of contract.

225.   GrowMI has been damaged by Shamo's and Causley's refusal to fund their obligations under the Lines of Credit.

226.   GrowMI seeks judgment as set forth below.

## Prayer for Relief

WHEREFORE, GrowMI respectfully requests that this Court enter Judgment in its favor and against Defendants as follows:

A.   Award money damages in favor of GrowMI and against Defendants, jointly or severally, sufficient to compensate GrowMI for all forms of economic loss including, without limitation, actual damages, lost profits, exemplary damages, interest, attorney fees, and costs;

B.   Treble damages as authorized by 18 U.S.C. § 1964;

C.   Award such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## JURY DEMAND

Plaintiff Grow Michigan, LLC hereby demands a trial by jury in this matter.

Respectfully submitted,

HOWARD & HOWARD ATTORNEYS, PLLC

By:s/ *H. William Burdett, Jr.*
   H. William Burdett, Jr. (P63185)
   Kory M. Steen (P83170)
450 West Fourth Street
Royal Oak, Michigan 48067
(248) 723-0381
bburdett@howardandhoward.com

Dated: June 1, 2020      *Attorneys for Grow Michigan, LLC*